IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| STACEY BERRIER, as Administrator of the Estate of Ryan Trowbridge, Decedent, | ) ) ) | CASE NO.  1:22 CV 813 |
| Plaintiff, | ) ) | |
| v. | ) ) | JUDGE DONALD C. NUGENT |
| LAKE COUNTY, OHIO, and LAKE COUNTY BOARD OF COMMISSIONERS *et al.*, | ) ) ) ) | MEMORANDUM OPINION AND ORDER |
| Defendants. | ) ) | |

This matter is before the Court on Defendant Defendants University Hospitals Health System, Inc. And Karim Razmjouei, M.D.'s Motion for Summary Judgment, and Supplemental Motion for Summary Judgment (ECF #28, 39, 41); Defendant Crossroads Health's Motion for Summary Judgment (ECF #37); and Defendants Lake County, Ohio, Lake County Board of County Commissioners, Frank Leonbruno, Capt. Cynthia Brooks, Bryan Pate, Patty Hammers, Rn, and Sabrina Watson, Rn's ("the Lake County Defendants"), Motion for Summary Judgment (ECF #40).  The Plaintiff filed a combined  Brief in Opposition responding to all pending Motions for Summary Judgment, and their Supplements.  (ECF #51).  Later, following receipt of a Supplemental Expert Report from Plaintiff's expert, Plaintiff  filed an Amended Brief in Opposition to Defendants' Motions for Summary Judgment.  (ECF # 56).[1]  Defendants each

---

[1]

In support of its Opposition, Plaintiff also filed a Request for Judicial Notice of Publically Available Materials on Government Websites.  (ECF #52).  Defendants did not file any

filed a Reply in support of their respective motion. (ECF #61, 62, 63). Defendants Lake County,

Ohio, Lake County Board of County Commissioners, Frank Leonbruno, Capt. Cynthia Brooks,

Bryan Pate, Patty Hammers, Rn, and Sabrina Watson, Rn' then filed a Supplemental Reply after

receiving the Plaintiff's Supplemental Expert Report and Affidavit of Glenn V. Dregansky.

(ECF #67, 68). Having considered all of the parties' submissions, as well as the relevant

evidence and applicable law, this Court finds that Defendants' Motions for Summary Judgment

should be GRANTED.

### Facts and Procedural History[2]

Ryan Trowbridge became addicted to prescribed pain pills following a medical procedure

in her early twenties. When she could no longer obtain prescription pain pills, she began using

heroin. She continued to regularly use illegally obtained opiates until 2016 when she first

attempted to get clean. Between 2016 and 2020 she suffered multiple relapses. By March of

2020, Ms. Trowbridge had been diagnosed with severe opioid use disorder and was prescribed 8

milligrams of Subutex (i.e. Buprenorphine) per day. Between March and June 2020, she reported

intensified cravings and her prescription was increased to 12 milligrams of Subutex per day. On

---

objection to this request. Therefore, the Court will consider this information to the
degree that it is relevant and appropriate.

[2]

Except as otherwise cited, the factual summary is based on the parties' statements of fact
and deposition transcripts and does not constitute a finding of fact by this Court. Those
material facts which are controverted and supported by deposition testimony, affidavit, or
other evidence are stated in the light most favorable to Plaintiff, the non-moving party and
accepted as true only for purposes of determining the summary judgment motions.
Plaintiff and the Lake County Defendants filed a Joint Stipulation Regarding the
Authenticity of Records with regard to records kept or created by Lake County or the Lake
County Defendants, and produced by Lake County Defendants and Lake County Sheriff's
Office.. (ECF #47).

June 1, 2020, Ms. Trowbridge visited her physician and her prescription was changed from Subutex to Suboxone.[3]  She received a one day supply of 12 milligram Suboxone on June 1, 2020, and was supposed to pick up an additional six day supply on June 2, 2020.

Ms. Trowbridge was arrested and taken into custody as a pretrial detainee at Lake County Adult Detention Facility on Tuesday, June 2, 2020.  Lake County Adult Detention Facility ("LCADF") is operated by the sheriff of Lake County.  (Leonbruno Dep. at 24-25).  It is the policy of LCADF to complete a Medical Screening form for each inmate upon their arrival at the facility.  (Leonbruno Dep. At 7-8).  The Medical Screening addresses multiple health related questions which are to be answered by the inmate, and allows for the intake staff to note relevant observations.  (Leonbruno Dep. at 18-20, and Ex. 2).  The screening form indicates that she did not appear to be under the influence of heroin or any other drugs.  Further, it indicates that there were no visible signs of withdrawal and she did no exhibit any behavior that would suggest the risk of suicide.  (ECF #51, pageID 1247).  The form states that she was either carrying or taking medication which "should be continuously administered or available."  It also contained the note

---

[3]

Subutex is comprised of the narcotic Buprenorphine.  Buprenorphine is safer than heroin because it is very rare to die from a overdose of Buprenorphine, Buprenorphine reduces opiate cravings, and it blocks the opioid receptors that would react with heroin so patients won't get any effect from using heroin but won't suffer withdrawal symptoms as long as they are taking it.  (Depo. Glenn V. Dregansky, D.O., at 89; Depo. Thomas Fowlkes, M.D., at 22-27; see also Depo. Karim Razmjouei, M.D. at 26).  Suboxone is made up of a mixture of Buprenorphine and Naloxone.  (Depo. McNaughton at 18-19).  When taken orally the Buprenorphine is absorbed and provides the same benefit as with Subutex, but if the mixture is melted down and injected, Naloxone blocks absorption of the Buprenorphine, preventing the opioid effect and precipitating withdrawal symptoms.  (Depo. Glenn V. Dregansky, D.O., at 89; Depo. Thomas Fowlkes, M.D., at 22-27; see also Depo. Karim Razmjouei, M.D. at 26).  This is intended to deter misuse of the Buprenorphine.  (Id.; Depo. McNaughton at 19).

"meds in booking."[4] (Id.). The listed medications were Buprenorphine, Sertraline, and Hydroxyzine. These three medications were held for physician's review. At intake, Ms. Trowbridge indicated that the last time she took her medications was "today," and that she needed them next "tonight." She did not specify which medications she needed that evening, or how many Suboxone pills she had taken that day.[5] According to Plaintiff's own expert, due to the long half-life of Suboxone, withdrawal symptoms, including GI upset are not expected to start until the end of the first day off the medication, between 24 and 48 hours after cessation. (Depo. Dregansky, D.O. at 86-87). Further, not everyone stops Suboxone will go through withdrawal. (Depo. Dregansky, D.O. at 70).

As part of the statewide COVID-19 lock down protocol in effect during the summer of 2020 all new inmates were required to be screened and isolated in individual cells for fourteen days upon arrival in order to limit the spread of COVID-19 within the jail.[6] Her Covid-19 screening form, indicates that Ms. Trowbridge had a cough, chills, and diarrhea.[7] She did not

---

[4]

   The number of pills remaining in the Suboxone bottles provided by Ms. Trowbridge on June 2, 2020 did not match the number prescribed minus those taken in accordance with the prescription. The prescription obtained on June 1, 2020 had one of three prescribed pills remaining, although she should have taken all three. The prescription obtained on June 2, 2020 had 10 out of 18 remaining, although she should have taken, at most, two of the prescribed pills by the time she was booked. (ECF #51, PageID 1244).

[5]

According to Plaintiffs statement of facts, Ms. Trowbridge's prescription for Suboxone was written for 12 milligrams, daily. (ECF #51, PageID1186).

[6]

   Inmates were permitted to leave their cells for one hour each day, but could not have physical contact with other inmates during the 14 day quarantine period. See, Depo. LeonBruno at 17).

[7]

The Covid-19 screening document is not dated, but it appears to have been completed by

register a fever at any point during the COVID-19 screening or subsequent checks.  Although chills and diarrhea can be symptoms of withdrawal, she also reported having a cough.  All three of these conditions are symptoms of COVID-19.  She did not report any other symptoms associated with withdrawal.  At no time, despite her past history of addiction and withdrawal, did she indicate that any of her symptoms, were in any way related to withdrawal from Suboxone or any other addictive substance.

Dr. Razmjouei reviewed her medications on June 4, the first day he was at the jail after Ms. Trowbridge was admitted.  He approved her Sertraline and Hydroxyzine, which treat depression and anxiety, respectively. (Depo. Razmjouei, M. D. at 43).  Hydroxyzine is also a recognized treatment for people going through withdrawal.  (Depo. Kalina-Hammond at 21, 68-69).  Dr. Razmjouei did not approve the Suboxone because it contains Buprenorphine, which is a narcotic, and  jail policy prohibits the use of narcotics in the prison.  (Id. at 31- 32, 34, 57; see also, Depo. Kalina-Hammond at 65).  Dr. Karim Razmjouei, M.D. testified in his deposition that the Lake County Jail's protocol did not allow him to approve the use of Suboxone, whether as a continuation of a inmate's on-going prescription or as a new medication for withdrawal.  (Depo. Razmjouei, M.D. at 32).[8]

Also on Thursday, June 4th, Ms. Trowbridge wrote a request that read as follows: "To please see a doctor about medications, and I was tested for the Coronarius two days ago.  I've

_____

Officer Sullivan, the same officer who performed Ms. Trowbridge's intake on June 2. Plaintiff asserts it was completed on June 3, 2020, but cites no basis for this assertion.

[8] An exception is made for pregnant women. (Depo. Razmjouei, M.D. at 33; Depo. Kalina-Hammond at 30; Depo. McNaughton at 17).

already had it, and I don't even have the antibodies anymore. I had to get tested for work."
Though marked as written on the 4th, the request was not received by corrections officer Pate until
Friday, June 5th. The request was delivered to the nursing staff, and was marked as reviewed on
June 7th. The next time Dr. Razmjouei was on site at the jail was Monday, June 8th. (See Depo.
LeonBruno at 41-44; Depo. Razmjouei, M.D. at 70 ). Therefore neither the nursing staff, nor Dr.
Razmjouei was aware of the medication request until after Ms. Trowbridge was hospitalized on
Saturday, June 6th

Nothing in Ms. Trowbridge's paperwork would have signaled to staff that she was going
through withdrawal while at the jail. (Depo. McNaughton at 35; Dregansky, D.O. at 78, 95).
There is also no evidence that she exhibited or complained of symptoms that would have alerted
staff that she was experiencing withdrawal. (See, generally, Depo. Watson at 55; Jackson at 8,
12, 93, 96; Razmjouei at 37-38; Dregansky, D.O. at 31-35). Further, there is no evidence that
would suggest that Ms. Trowbridge was experiencing a strong likelihood of suicidal ideation
prior to her suicide attempt. (Dep. Dregansky, D.O. at 31-34, 71, 74-75; Jackson at 41-43, 79).

On June 6, 2020, Ms. Trowbridge spoke on the phone with her boyfriend. There is no
evidence that she exhibited signs of depression or suicidal ideations during that call. (Depo.
Dregansky, D.O. at 31-34). Following that call, Ms. Trowbridge waited until the correction
officers had completed their check of her cell, then attempted to hang herself with a bed sheet
from her bunk. She was discovered, received medical attention, and was taken to a hospital. She
died from complications arising from her suicide attempt on June 21, 2020.

## Summary Judgment Standard

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing prior FED. R. CIV. P. 56©). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, a material fact is one that "would establish or refute an essential element of the cause of action or defense." *Bruederle v. Louisville Metro. Govt.*, 687 F.3d 771, 776 (6th Cir. 2012). A factual issue is in "genuine" dispute when, applying the appropriate evidentiary standards, reasonable minds could differ as to the truth of that fact. See, *Henschel v. Clare Cty. Rd. Comm.*, 737 F.3d 1017, 1022 (6th Cir. 2013). The court will view the summary judgment motion in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Laplante v. City of Battle Creek*, 30 F.4th 572, 578 (6th Cir. 2022).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be

-7-

evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citations omitted). In most civil cases involving summary judgment, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252. However, if the non-moving party faces a heightened burden of proof, such as clear and convincing evidence, it must show that it can produce evidence which, if believed, will meet the higher standard. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

Once the moving party has satisfied its burden of proof, the burden then shifts to the non-mover. The non-moving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). Evidence may be presented by citing to particular parts of the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials. Fed. R. Civ. P. 56©. In lieu of presenting evidence, Fed. R. Civ. P. 56© also allows that a party may show that the opposing party's evidence does "not establish the presence of a genuine dispute" or that the adverse party "cannot produce admissible evidence to support the fact."

According to Fed. R. Civ. P. 56(e),

[i]f a party fails to properly support an assertion of fact, or fails to properly address another party's assertion of fact as required by Rule 56©, the court may:

-8-

(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or

(4) issue any other appropriate order

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.   As a general matter, the district judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law." *Anderson*, 477 U.S. at 248.  The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter. *Id.* at 249.  The judge's sole function is to determine whether there is a genuine factual issue for trial; this does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

## Analysis

Plaintiff brings three causes of action against ten separate defendants.  The first cause of action is a claim for deliberate indifference under 42 U.S.C. §1983 and the Eighth Amendment of the United States Constitution.  This claim is made against all ten defendants and rests on the premise that Ms. Trowbridge had a serious medical need that was treatable with Suboxone, and she was deliberately denied access to this medication.  The Second cause of action is a claim for failure to train under  42 U.S.C. §1983.  This claim is brought against the County, Sheriff Frank

Leonbruno, Captain Cynthia Brooks, Crossroads, University Hospitals, and Dr. Razmjouei, D.O. Each of these defendants is charged with deliberately failing to promulgate adequate procedures policies and protocols which would address significant, serious known risks of opioid use, and/or withdrawal.  Finally, Plaintiffs raise a wrongful death claim under Ohio law, alleging that all defendants exhibited a willful, wanton, malicious, and/or conscious disregard for the health and safety of Ms. Trowbridge, by denying her access to medical care.

A.  Deliberate Indifference

Plaintiff claims that Defendants acted with deliberate indifference to Ms. Trowbridge's medical needs in violation of the Eighth Amendment to the United States Constitution.  The claim is brought pursuant to 42 U.S.C. §1983.  A claim brought under 42 U.S.C. §1983 must establish that the plaintiff suffered a deprivation of a right secured by the United States Constitution or the laws of the United States, and that the deprivation was caused by a person acting under color of state law.  See, e.g., *Ellison v. Garbarino*, 48 F.3d 192, 194 (6th Cir. 1995). In this case the Defendants do not challenge the premise that they were acting under color of state law.  Therefore, the Court must only address whether Ms. Trowbridge was denied a right secured to her by the Constitution or the laws of the United States.

The Eighth Amendment, because it is concerned with the conditions of punishment, applies only to post-conviction inmates and not to pre-trial detainees.  However, similar protections are afforded to pre-trial detainees through the Fourteenth Amendment.  *Ford v. County of Grand Traverse*, 535 F.3d 483, 495 (6th cir. 2008); *see also*, *Thompson v. County of Medina, Ohio,* 29 F.3d 238, 242 (6th Cir. 1994).  Prior to 2021, the Sixth Circuit applied the same standard created by the U.S. Supreme Court under the Eighth Amendment to claims brought by

-10-

pre-trial detainees under the Fourteenth Amendment. *See, e.g., Richmond v. Huq.,* 885 F.3d 928, 937 (6th Cir. 2018); *Miller v. Calhoun Cty.,* 408 F.3d 803 (6th Cir. 2005); *Ford v. Cnty of Grand Traverse,* 535 F.3d 483, 495 (6th Cir. 2008).

There is both an objective and a subjective component to a deliberate indifference claim under the Eighth Amendment.

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer v. Brennan,* 511 U.S. 825, 837 (1994). To demonstrate the objective component, Plaintiff must prove the existence of an "an objectively serious medical need." *See, Miller v. Calhoun Cnty.,* 408 F.3d 803 (6th Cir. 2005); *Batton v. Sandusky Cty., 2024 U.S. App. Lexis 8330, *7-8 (6th Cir. April 5, 2024); Comstock v. McCrary,* 273 F.3d 693, 702-703 (6th Cir. 2001); *see also, Farmer v. Brennan,* 511 U.S. 825, 837 (1994). A sufficiently serious medical need exists if the detainee was "incarcerated under conditions imposing a substantial risk of serious harm." *Id.* at 384. The subjective component requires that the Defendant have actual knowledge of that risk, or knowledge of facts that leads them to draw the inference that the risk exists, and that they ignore that risk. Recklessness, negligence, and accident are insufficient to support a claim for deliberate indifference under the Eighth Amendment, or a pre-2021 claim under the Fourteenth Amendment.

In *Brawner v. Scott Cty.,* decided on September 22, 2021, the Sixth Circuit revised the standard for deliberate indifference claims brought by pre-trial detainees, replacing the subjective

component with reduced level of intent. *See, Brawner v. Scott Cty*, 14 F.4th 585, 605, 608-09 (6th Cir. 2021); *Helphenstine v. Lewis Cty.*, 60 F.4th 305, 316-17 (6th Cir. 2023); *Batton v. Sandusky Cty.* 2024 U.S. Lexis 8330, *7-9 (6th Cir. April 5, 2024).[9] Since the *Brawner* decision in 2021, a deliberate indifference claim made on behalf of a pre-trial detainee under the Fourteenth Amendment continues to have two components, one focused on the existence of a serious medical need, and the second focused on the defendant's degree of knowledge or intent. *Batton v. Sandusky Cty., 2024 U.S. App. Lexis 8330, *7-8 (6th Cir. April 5, 2024); Comstock v. McCrary*, 273 F.3d 693, 702-703 (6th Cir. 2001); *see also, Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Although the existence of a serious medical need remains a primarily objective component post-*Brawner*, this criteria is only satisfied if the serious medical need is, or should have been known to the defendant. "A medical need is sufficiently serious if it has been diagnosed by a physician that had mandated treatment or it is so obvious that even a lay person would easily recognize the need for medical treatment." *Burgess v. Fischer*, 735 F.3d 462, 476 (th Cir. 2013); *Gomez v. City of Memphis*, 2023 U.S. App. LEXIS 20180, *10-11 (6th Cir. 2023). Further, what was previously the subjective prong of the deliberate indifference standard can now be established if a defendant "acted deliberately (not accidentally), but also recklessly "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Helphensitine v. Lewis Cty., Kentucky*, 60 F.4th 305, 317 (6th Cir. 2023)(internal quotations omitted); *Gomez* at *13. Therefore, post-*Brawner*, a pre-trial detainee must prove "more than

---

[9]

That decision relied on the Supreme Court's decision in *Kingsley v. Hedrickson*, 576 U.S. 389 (2015), which recognized a different standard for subjective intent in excessive force cases involving pre-trial detainees.

-12-

negligence but less than subjective intent – something akin to reckless disregard." *Brawner v.*
*Scott Cty.*, 14 F.4th 585, 596-97 (6th Cir. 2021).

    1. <u>Qualified Immunity</u>

    "Government officials performing discretionary functions generally are shielded from
liability for civil damages insofar as their conduct does not violate clearly established statutory or
constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*,
457 U.S. 800, 818 (1982); see also, *Mullein v. Luna*, 136 S. Ct. 305, 308 (2015)(citing *Person v.*
*Callahan*, 555 U.S. 223, 242 (2009)). It is "an immunity from suit rather than a mere defense to
liability." *Mitchell v. Forsyth*, 472 U.S. 511, at 526 (1985). Qualified immunity is an
affirmative defense. *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014). It is applied using a two part
test, which may be conducted in either order. *Sumpter*, 868 F.3d at 480. Courts must determine
(1) whether the alleged acts or omissions violate a constitutional right, and, (2) whether at the
time of the actions, the constitutional right was "clearly established." *Saucier v. Katz*, 533 U.S.
194 (2001).

    Once asserted, the plaintiff bears the burden of demonstrating that qualified immunity
should not apply. *See*, *Id; Sumpter v. Wayne Cty.*, 868 F.3d 473, 480 (6th Cir. 2017). To defeat
this defense, a plaintiff must establish both that a constitutional violation occurred, and that a
reasonable official in the defendant's position should have known, at the time of the conduct, that
his or her conduct violated a clearly established statutory or Constitutional right. *Harlow v.*
*Fitzgerald*, 457 U.S. 800, 818 (1982). Generally this involves identifying "pre-existing Supreme
Court or Sixth Circuit precedent that would have put a reasonable officer on notice that her
specific conduct was unlawful." *Campbell v. Riahi*, Case No. 23-3793 (6th Cir., July 29, 2024);

*see also*, *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021). The application of qualified immunity is determined as a matter of law, not as a matter of fact. *Harvie v. Jackson*, 845 F.2d 647, 649 (6th Cir. 1988); *Monday v. Oubliette*, 118 F.3rd 1099 (6th Cir. 1997)

Defendants Karim Razmjouei, M.D., Frank Leonbruno, Capt. Cynthia Brooks, Bryan Pate, Patty Hammers, RN, and Sabrina Watson RN all argue that they are entitled to qualified immunity. Generally, when determining whether qualified immunity applies, each official's conduct must be evaluated separately. *Jones v. City of Elyria, Ohio*, 947 F.3d 905, 913 (6th Cir. 2020). Each officer is accountable only for their own actions and their conduct cannot be lumped together with. *Id.* Below are summaries of each official's relevant conduct and interactions with Ms. Trowbridge or her file.

Dr. Razmjouei: During the relevant time period, Dr. Razmjouei was on-site at the Lake County jail on Mondays and Thursdays, and was on call for phone consultations with the on-site nurses. (Depo. Razmjouei, M.D. at 15-17). In order to see patients, they would have to be brought to his attention. Generally, to be seen, an inmate would notify a corrections officer of a need, the officer would notify a nurse, and a nurse would screen the inmate to determine if a doctor's visit was necessary. (*Id.* at 19). Dr. Razmjouei is also tasked with approving medications that a inmate has with them or reports using during intake. (Id. at 22-23).

Ms. Trowbridge came into the facility on the night of Tuesday, June 2, 2020. Dr. Razmjouei was not on duty that day. He did review her medications and the notes in her file indicate that he approved her anxiety and depression medications on June 3, 2020. He was at the facility for the first time after Ms. Trowbridge's intake on June 4, 2020. At that time he continued the hold on her Suboxone prescription in accordance with the facility's policy not to

-14-

provide inmates with narcotics.   He testified that he was following Lake County's Jail's policy that prevented the dispensation of Suboxone and other narcotics to inmates while they were within the facility. (Depo. Razmjouei, M.D., at 33, 34,37, 57; see also, Depo. McNaughton at 44). He also testified that he never saw Ms. Trowbridge in person,[10] he never saw any indication that she was experiencing withdrawal,  and he was never told by anyone that she was experiencing withdrawal symptoms.  (*Id.* at 36-38, 65, 70, 76).  He also saw no indication in any of her records that she had any signs or symptoms of suicidal ideations or of being at high risk for suicide.  (*Id.* at 76.).

Sabrina Watson, RN:  Nurse Watson received Plaintiff's medication through the intake process.  She made the notation to hold certain medications for review by Dr. Razmjouei, in accordance with jail policy.  (Depo. Watson, RN at 26-27).  There is no evidence that she was aware that Ms. Trowbridge had any withdrawal symptoms or other serious medical needs.  She testified that when inmates are going through withdrawal it would be obvious and if she was aware, she would address any medical needs quickly.  (Depo. Watson, at 37-38, 54-55).  There is no evidence that she was aware that Ms. Trowbridge was at substantial risk of suicidal ideations.

Patricia Hammers, RN:  Nurse Hammers  never personally encountered Ms. Trowbridge. She simply processed the medications from the medication locker, based on Nurse Watson's notes.  (Depo . Hammers at 58-60).  She did not provide Ms. Trowbridge with her Suboxone because her understanding of the jail policy was that narcotics could not be provided to inmates

---

10

   Dr. Razmjouei worked at the jail on Mondays and Thursdays.  Ms. Trowbridge was brought in on a Tuesday and taken to the hospital the next Saturday, following her suicide attempt.  (Depo. Razmjouei, M.D. at 70).

and because Dr. Razmjouei did not approve it. She had no independent authority to distribute Suboxone to Ms. Trowbridge. There is no evidence she was aware that Ms. Trowbridge was experiencing any withdrawal symptoms or suicidal ideations.

Bryan Pate: Correction Officer Pate had no conversation with Ms. Trowbridge. His only interaction with her was to obtain her medical request form and route it to the medical staff. The evidence suggest that he received the form on June 5, 2020, and he delivered it medical staff who logged it in on June 7, 2020. (Depo. Pate at 13-16). Even if he could have expedited its delivery or review, the request was general and contained no indication of urgency. Further there is no evidence to suggest that the delay in processing Ms. Trowbridge's request for a doctor's visit would have changed the outcome in this case. There is no evidence that he was aware that Ms. Trowbridge was at any risk for withdrawal or suicidal thoughts or actions.

Captain Brooks/Sheriff Leonbruno: Neither Captain Brooks, nor Sheriff Leonbruno had any contact with Ms. Trowbridge during her detention. (Depo. Leonbruno; Depo. Brooks at 8). There is no evidence that either of these defendants were aware that Ms. Trowbridge suffered from addiction, or that she had been prescribed Suboxone by an outside doctor. There is also no evidence that they were aware that she was experiencing, or was at substantial risk for experiencing withdrawal symptom or suicidal thoughts.

In this case, because the standard for proving deliberate indifference was more stringent at the time of the conduct than at the time the claim was filed, the court will look first at the question of whether the asserted right was "clearly established at the time of alleged violation."

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Campbell v. Riahi*, Case No.

23-3793,pg. 7 (6th Cir., July 29, 2024)(quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)*(per curiam*); see also, *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *District of Columbia v. Wesby*, 138 S. Ct. 577 (2018)(citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). The determination must be based on what a reasonable defendant would believe or understand under the circumstances, given what information was known to the defendant at the time. *White v. Pauly*, 137 S.Ct. 548, 550 (2017); *Kinsley v. Hendrickson*, 135 S. Ct. 2466, 2474 (2015); *Fox v. DiSoto*, 489 F.3d 227 at 236 (6th Cir. 2007). The standard is objective, and must not be applied using hindsight unavailable to the officers at the time the action were taken. *Id.*

Although the parties do not dispute that a pre-trial detainee's general right to receive medical treatment for a serious medical need was established before the conduct in this case occurred, for purposes of determining qualified immunity, "[c]learly established law may not be defined at such a high level of generality." *Arrington-Bey v. City of Bedford Heights, Ohio*, 858 F.3d 988 (6th Cir. 2017)(quoting *Est. of Carter v. City of Detroit*, 408 F.3d 305, 313(6th Cir. 2005). The right must be clearly established in a "particularized sense," and "in light of the specific context of the case, not as a broad general proposition." *Johnson v. Moseley*, 790 F.3d 649, 654 (6th Cir. 2015)(citing *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). Plaintiff cites *Rhodes v. Michigan*, 10 F.4th 665, 680 (6th Cir. 2021) for the proposition that they do not have to provide case law specific to the medication at issue in this case. However, while the exact nature of an individual's medical complications need not be mirrored in the case law, the context must be "sufficiently analogous" as to put a reasonable official on notice that they were violating the detainee's rights. *Id.* at 679. Thus the context of prison matters, as does the nature of the medication withheld, the availability of other methods of addressing a need, and the individual's

-17-

manifestation of need.

When determining whether an defendant had fair notice that their conduct was unlawful, the court must consider "the law at the time of the conduct." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018). The conduct that gave rise to this action occurred in June of 2020, which was before the 2021 *Brawner* decision changed the test for deliberate indifference to the medical needs of a pre-trial detainee. *Brawner v. Scott Cty.*, 14 F.4th 585 (6th Cir. 2021).[11] The only clearly established law at the time of the conduct was established by *Farmer*, which held that a defendant could only be liable for deliberate indifference to the medical needs of a detainee if they were subjectively aware of facts that established a substantial risk of serious harm to the inmate and the defendant actually concluded that the risk existed. *Lawler* at 927-28. It would not have been enough, under the standard in existence at the time of the conduct, that the defendants acted recklessly. *Id.*

Plaintiff identifies two separate points when Ms. Trowbridge was allegedly harmed by the Defendant's deliberate indifference to her serious medical needs.

    a. <u>Withholding Prescribed Suboxone/General Withdrawal</u>

Plaintiff argues that Ms. Trowbridge had a clearly established constitutional right to receive her prescribed medication, Suboxone. The cases cited by Plaintiff in their arguments against immunity do establish that the denial or delay of recommended or prescribed treatments *could* constitute a constitutional violation if they satisfy the other requirements of deliberate indifference. They do not hold, however, that the delay or denial of a particular prescription or

---

[11] Prior to *Brawner*, a pre-trial detainee's right to be free from reckless, rather than knowing, disregard to a serious risk of harm was not clearly established. See, *Lawler v. Hardeman Cty.*, 93 F.4th 919, 926-928 (6th Cir. 2024)(citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

treatment plan necessarily constitutes deliberate indifference in all cases. *Santiago v. Ringle*, 734

F.3d 585, 591 (6th Cir. 2013).  Not every deprivation of medical care rises to the level of a

constitutional violation. *See generally*, *Griffith v. Franklin Cty.*, 975 F.3d 554, 567 (6th Cir.

2020).  In order to rise to the level of deliberate indifference, denial or delay of treatment must

still subject the detainee to an unjustifiably high risk of serious medical consequences.  In

addition, in June of 2020, in order to be an actionable violation, each individual defendant would

have had to (1) been subjectively aware of facts that established a substantial  risk of serious

harm, and (2) actually concluded that the risk existed.

      The failure to act must be in the face of "an unjustifiably high risk of harm that is either

known or so obvious that it should be known."  The justification for providing or withholding

medication and other medical treatment can vary depending of the context and circumstances.  In

this case to be unjustifiable, the benefit of using prescription narcotics for addiction and pain

management must have outweighed the facility's justification that it has obligation to reduce

prescription misuse and its accompanying harms.

      The available case law in June of 2020 did not clearly establish that an inmate, whether

pre-trial or post-sentencing, had a right to receive narcotics as treatment for an addiction disorder

while incarcerated.  Therefore,  Defendants were not on notice that withholding prescription

Suboxone in a jail setting was a violation of Ms. Trowbridge's constitutional rights.   The case

law at the time held that failure to provide medication prescribed by a specialist or outside

physician does not necessarily equate to inadequate care. *Rhinehart v. Scutt*, 894 F.3d 721, 742-

43 (6th Cir. 2018).   If a treatment recommended by an outside doctor was not implemented, but

an alternative treatment plan was put in place, the plaintiff would only be liable if there was

medical proof that the alternative treatment was inadequate. *Santiago* at 591; *Rhinehart*, 894 F.3d at 742-43.

In this case, the jail's treatment plan for withdrawal was to prohibit use of narcotics in the jail, but to provide alternate care for withdrawal through the use of comfort medication and other accepted medications that could be administered within the facility to treat individual symptoms.[12] (Depo. Razmjouei at 29-30). If those treatments were insufficient to bring an inmate safely through the withdrawal process, the inmate could be taken to an outside medical facility where Suboxone could be provided. (Depo. Razmjouei at 30). It is not the first choice for treating withdrawal, but it is not prohibited if it becomes necessary. (Id.)

When prison doctors pursue a different method of treatment than was prescribed or recommended by an outside physician, a plaintiff cannot recover unless they can provide medical proof that the alternative treatment is so inadequate that it constitutes a conscious disregard for the risk faced. *Santiago at 591*. Dr. Razmjouei testified that the first line of treatment for people who go into withdrawal at the jail, or at the hospital are the same. In either situation, treatments would be directed at the specific symptoms the patients exhibit. For example, with "nausea, vomiting, abdominal pain, shivering" they are given IV fluids, pain medication, or anti-anxiety

---

[12]

Absent a Constitutional violation, the balancing of potential harms that could arise from either withholding prescribed narcotics or allowing them to be distributed within a detention facility is a medical and policy decision that is better suited to the medical professionals and jail administrators. The court's role is not to determine what makes good policy or best practices. "[F]ederal judges are not free to turn the [Constitution] into a 'font of tort law' by imposing their own views about the optimal balance between protecting the liberty of a state's prisoners and ensuring the security of its prisons. *Johnson v. Sootsman*, 79 F.4th 608, 622 (6th Cir. 2023)(citing *Leary v. Livingston Cty.*, 528 F.3d 438, 443, 445 (6th Cir. 2008)).

medication.  (Depo. Razmjouei at 29).  He may also give them clonidine or a similar type of medication if their blood pressure is okay.  (Id.)  If those treatments don't work then Suboxone may be administered at an outside medical facility.  (Id. at 30).  Plaintiff has presented no medical proof that providing non-narcotic medication to treat individual symptoms of withdrawal, should they occur, is an inadequate medical response for treating opioid addiction in jail,[13] nor have they cited any case authority clearly establishing that providing alternative treatments would be a constitutional violation.

Further, there was no case law that would have clearly established that officials were constitutionally deficient for not preemptively treating inmates for potential withdrawal, where the patient did not manifest any symptoms suggesting a substantial risk of a serious medical need. If the patient receives "treatment consistent with the symptoms presented" and a known condition is not ignored, an inference of deliberate indifference is unwarranted. See, *Rhinehart at 742-43* (quoting *Self v. Crum*, 439 F.3d 1237, 1233-33 (10th Cir. 2006).  There is no testimony that suggests that withdrawal from opioids or Suboxone needs to be preemptively treated even if the patient shows no observable signs of withdrawal.   Plaintiff's own expert testified that not everyone who is taken off Suboxone goes through withdrawal, and of those that do, not every withdrawal creates a serious health issue.  (Depo. Dregansky, D.O. at 35, 38; see also Depo. Joshua, M.D. at 55; Depo. Fowkles, M.D. at 84; Depo. Parker at78).  He further agreed that if an inmate were experiencing higher level withdrawal, or "florid withdrawal" as he opined Ms.

---

[13] Though this does not address long term cravings or a risk of relapse, that risk is mitigated because she was detained, her access to opioids was restricted. Upon leaving the facility she could have returned to taking Suboxone with a prescription from her provider.

Trowbridge was experiencing in his expert report, "we would certainly expect to see symptoms of withdrawal." (Depo. Dregansky, D.O. at 69).  Yet, he also agreed that there is no evidence that Ms. Trowbridge was exhibiting these symptoms.  (*Id.*; see also Depo. McNaughton at 36-38).

More importantly, under *Farmer's* subjective test, there is no evidence that the officials at the jail perceived that Ms. Trowbridge was at substantial risk of suffering serious withdrawal symptoms or other serious medical issues from having her Suboxone withheld.  She did not complain of or exhibit any withdrawal symptoms requiring treatment.  (See, Depo. Dregansky, D.O. at 31-33, 69).  She did not complain of or exhibit any other serious medical symptoms, stemming from her lack of treatment for opioid addiction. (Id. at 31-33, 69, 70-71).    The tapes of her phone calls from the jail did not reveal any indication that she was suffering from severe or even moderate withdrawal.  (Depo. Joshua, M.D. at 35).  She did report having diarrhea, chills, and a cough when she was screened for COVID-19, but she did not attribute these symptoms to withdrawal, and there is no evidence that any Defendant attributed these symptoms to potential withdrawal.[14]   There is no evidence that any Defendant had knowledge of any facts that would have suggested that she was suffering from serious withdrawal.  There is no evidence that any symptoms she had were caused by withdrawal, or the jail's failure to provide her with Suboxone.[15]  There is no evidence that she ever complained of or exhibited any symptoms

---

[14] If they were, in fact, a symptom of withdrawal, the failure to attribute them to potential withdrawal, rather than viewing them as potential COVID-19 symptoms would amount to no more than negligence.  Jail officials continued to monitor Ms. Trowbridge for COVID-19 symptoms by, at least, taking her temperature at required intervals.

[15] Plaintiff's expert, Dr. Dregansky, opined in his supplemental report that withdrawal caused Ms. Trowbridge's symptoms of cough, diarrhea, and chills because "if the symptoms were from an infectious condition, she would likely have had a fever, which she did not." (ECF

whatsoever after mentioning that she had experienced cough, diarrhea, and chills during her COVID-19 screening.[16]

Though she submitted a request asking to see a doctor about medications and referencing prior COVID-19 testing, she did not specifically ask about Suboxone, did not complain of any serious health issue, or request any medical attention for withdrawal, symptoms associated with withdrawal or opioid addiction.[17] Plaintiff has cited no authority that would have clearly

#51, PageID 1256). He does not account for the fact that no one has attributed the existence of a cough as a symptom of withdrawal. He also does not state with a reasonable degree of medical certainty that these symptoms could not have been caused by some condition other than withdrawal. Dr. Dregansky does again list other known symptoms of withdrawal that would include muscle aches and headaches. (Id). There is no evidence Ms. Trowbridge suffered from muscle aches, headaches, or any of the other symptoms Dr. Dregansky previously associated with withdrawal. (ECF #51, PageID 1236). Yet he accepts that she was going through withdrawal even though, according to Dr. Dregansky, himself, she would have likely experienced these symptoms if she were experiencing withdrawal. (Depo. Dregansky, D.O. at 31-33).

[16]

At the time of her detention the jail was on a COVID-19 lock down protocol. There was a significant focus on identifying COVID-19 in detainees and preventing its spread throughout the facility.

[17]

Plaintiff's expert, Dr. Dregansky, stated in his report that Ms. Trowbridge communicated that she needed to see a doctor about her "not receiving the medication," with "the medication" referring to Suboxone. (ECF #51, PageID1235). He also stated that she "requested to see a doctor regarding her need for Suboxone." (ECF #28, PageID 222). These statements are not supported by the evidentiary record. What she actually requested was "to please see a doctor, about Medications." (ECF #51, PageID 1259). The documents do not support Dr. Dregansky's assumption that she was referencing Suboxone in this request, or that she was "not receiving" a medication. Ms. Trowbridge was on multiple medications. She entered the facility with four prescription bottles (three different medications). (ECF #51, PageID 1244). Two were provided to her once reviewed, which appears to have been signed off on June 3, 2020. (Id). On June 4, 2020, the day she dated her request, multiple other prescriptions had been dropped off to the facility by her family. (Id). Her medication request did not specify what medications she wanted to discuss with the doctor. It could have been any of the 10 prescriptions logged in by June 4, 2020, or something new that would address the symptoms she reported during

-23-

established that Defendants could be held liable for failing to allow Ms. Trowbridge to take prescribed narcotics within the jail, during her period of detention. Further, no admissible evidence supports a finding that disallowing the use of narcotics in detention facilities violated the accepted standard of care in June of 2020.[18] Plaintiff provides no case law, prior to June 2020, that found a defendant had violated an inmate's constitutional rights by means of exhibiting deliberate indifference to a serious medical issue in the absence of some outward manifestation of symptoms that were knowable to the defendant. *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013)(despite complaining of severe pain, plaintiff did not prove deliberate indifference from delayed treatment because there was no medical proof that he proved he faced substantial risk without recommended treatment, or that doctor perceived a significant risk by denying treatment); *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)(failure to diagnose and other forms of

---

her COVID-19 screening, or otherwise had questions about. (See Depo. Fowlkes, M.D. at 62-64).

[18]

Plaintiff's expert Dr. Dregansky, stated in his report that "MOUD" (Suboxone) and counseling, used together is "the standard of care based on the current understanding of the disease of opioid addiction," and "forcing withdrawal violates the standard of care in treating a person with opioid addiction." (ECF #51, PageID 1236-27). The report was written August 5, 2022 and does not speak to the standard of care in June of 2020, nor within the specific context of incarceration. He acknowledges that, when opining on standard of care, he is referring to care in the private medical community. (Depo., Dregansky, D.O. at 73-74). He also acknowledges that "many penal facilities" believe that "Suboxone or other MOUD treatments should not be allowed in penal facilities." (ECF #51, PageID 1237). During his deposition he admitted that he has "no expertise to say anything about jail physicians." (Depo. Dregansky, D.O. at 55, 73-74), and that the standard of care would take into account the community in which it is provided and the level of expertise of the provider. (Id.) Dr. Fowles, M.D. testified that administration of buprenorphine in the form of Subutex or Suboxone was not the standard of care for medical providers in a jail setting. (Depo. Fowles, M.D. at 72-74, 83).

-24-

medical malpractice do not constitute deliberate indifference - despite claims of pain); *Boretti v. Wiscomb*, 930 F.2d 1150 (6th Cir. 1991)(deliberate indifference possible where inmate informed jailers of need for wound treatment and pain medication on multiple occasions, both in person and by written request for medical attention, yet nurse refused to treat his gunshot wound or contact the doctor for five days); *Murray* v. Ohio, 29 F.4th 779, 786-87 (6th. Cir 2022)(not in effect at time of events - and applied different standard than is applicable in this case)(deliberate indifference possible when inmate had known serious health issue with life threatening effects, was outwardly symptomatic, repeatedly complained of serious symptoms and officials still failed to do necessary monitoring); *Rhinehart*, 894 F.3d 721 ("A prison doctor's failure to follow an outside specialist's recommendation does not necessarily establish inadequate care" - held that plaintiff must establish a detrimental effect and show subjective component is met).

In contrast to cases cited by Plaintiff where immunity was not granted, there is no evidence that Ms. Trowbridge ever complained that she was going through withdrawal, or that she exhibited any serious signs of withdrawal or other serious medical needs.[19] (Depo. Dregansky, D.O. at 31-33; Depo. Joshua, M.D. at 35). Further, she was receiving medication that satisfied part of the jail's withdrawal treatment plan, and should have alleviated some of the

---

[19] Plaintiff's expert stated in his report that "abrupt cessation" of Suboxone, or other opioid "causes a severe withdrawal syndrome characterized by pain, agitation, gastrointestinal disturbance, vivid dreams, and flu-like symptoms." (ECF #28, PageID 222). There is no evidence that Ms. Trowbridge experienced pain, agitation, or vivid dreams. Dr. Dregansky admitted that when he wrote his report he had no evidence that Ms. Trowbridge had any pain, agitation, runny nose, goosebumps, GI upset, nausea, vomiting, anxiety, or suicidal ideations, all of which he believed would be caused by Suboxone withdrawal. (Depo. Degransky, D.O., Page 31-33). There is also no evidence that the diarrhea and chills she reported during COVID-19 screening were serious or long lasting, or that these symptoms were related to withdrawal rather than COVID-19 or other conditions.

issues of concern during withdrawal, such as regulating blood pressure and reducing anxiety and depression.[20]   (Depo. Dregansky, at 38-39; Depo. Kalina-Hammond at 20-21).   There is no medical evidence to support a finding that defendants were deliberately indifferent to her needs under the *Farmer* standard, or that her treatment was inadequate based on her symptoms, or lack thereof.

### b. Preventative Care for Withdrawal/Suicidal Ideation

Plaintiff also argues that Ms. Trowbridge had a separate constitutional right to preventative medical care because she was at substantial risk for suicide.   The "bar for establishing liability is even higher" in cases involving suicide because is "a difficult event to predict and prevent and often occurs without warning." *Baker-Schneider v. Napoleon*, 769 F.Appx' 189, 193-94 (6th Cir. 2019)(quoting *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005)).   A plaintiff may not rely on generic risk factors when trying to prove that officials were aware that the detainee was at high risk for harm.   Even if plaintiff could show that Ms. Trowbridge "fit[] the profile" of someone who generally poses a suicide risk, this would not be sufficient to defeat qualified immunity or summary judgment. *Lawler* at 931 (citing *Downard*, 968 F.3d at 601; *Mantell*, 612 F. App'x at 307; *Crocker ex rel. Tarzwell v. Cnty. of Macomb*, 119 F.App'x 718, 721, 721 (6th Cir. 2005)).   Rather, a plaintiff is required to present evidence that each defendant knew of specific facts showing that this particular inmate was a high suicide risk, based on observable factors that extend beyond simply being a member of a "high-risk group."

---

[20] Ms. Trowbridge was taking hydroxyzine and antidepressants in the jail.  Both can be used to treat symptoms of withdrawal.  Hydroxyzine "may blunt some of the anxiety of the withdrawal..." and antidepressants could reduce the effects of withdrawal.  (Depo. Dregansky, D.O. at 38-39).

*Lawler* at 931-32; *Downard*, 968 F.3d at 601; see also, *Barber v. City of Salem*, 953 F.2d 232, 239 (6th Cir. 1992).  Those facts do not exist in this case.

Plaintiff's expert report, and indeed its entire case, relies entirely on the premise that Ms. Trowbridge was a member of a high risk group (opioid addicts) who might suffer withdrawal and whose withdrawal symptoms could include suicidal ideations.  (Depo. Dregansky, D.O. at 69-71).  Plaintiff's expert, Dr. Dregansky, admits, however, that Ms. Trowbridge, herself, had "absolutely no symptomology that would demonstrate withdrawal," or suicidal ideation.  (Depo. Dregansky, D.O. at 69-71, 95).  He also readily admits that his opinion, as stated in his report, is an "inference with essentially no evidence to draw it from."  (Id.).  He agrees that there is no evidence that would allow anyone to know whether Ms. Trowbridge even suffered from withdrawal from Suboxone, let alone whether she experienced suicidal ideations as result of her withdrawal.  (Depo. Dregansky, D.O., at 70-71).[21]

The Sixth Circuit has held that officials are not liable for a detainee's suicide unless the estate can "prove more than that an officer knew of a 'possibility' or 'even a likelihood' of the suicide."  *Id.* (quoting *Downard ex rel. Downard v. Martin*,  968 F.3d 594, 601 (6th Cir. 2020).  The fact that a detainee is going through withdrawal, even when they are refusing medication and meals, is not sufficient to prove official liability for a suicide.  *Broughton v. Premier Health Care Servs.*, , 656 App'x 54, 57 (6th Cir. 2016); *Lawler* at 930.  Further, summary judgment has been

---

[21]
As a matter of law, this does not provide the proper foundation for Dr. Dregansky to offer a medical opinion on whether Ms. Trowbridge experienced withdrawal or suicidal thoughts with a reasonable degree of certainty.  Expert reports and testimony must provide information on "how" and "why" the expert reached a certain conclusion, not merely conclusory statements in the form of opinions.  *Automated Sols. Corp. v. Paragon Data Sys., Inc.*, 756 F3d 504, 521 (6th Cir. 2014)(citations omitted).

granted in favor of officers even when they had knowledge of an inmate's depressed or despondent condition, previous attempts, or even recent suicidal thoughts that the inmate later disclaimed.  *See, e.g., Lawler* at 929-30 (applying pre June 2020 law) (citing *Broughton*, 656 App'x at 57, *Stewart v. Warren Cty Bd. Of Comm'rs*, 821 F.App'x 564, 571-72 (6th Cir. 2020)); *Grabow v. Cty. of Macomb*, 580 F. App'x 300,310-11 (6th Cir. 2014); *Nallani v. Wayne Cty.*, 665 F. App'x 498, 507-08 (6th Cir. 2016); *Starcher v. Corr. Med. Sys., Inc.*, 7 F.App'x 459, 465 (6th Cir. 2001); *Mantell v. Health Prof'ls Ltd.*, 612 F. App'x 302, 306 (6th Cir. 2015)).  These cases would have informed the conduct at issue in this case during June of 2020, and they support the application of qualified immunity in this case.[22]

The Plaintiff has failed to provide any case law upon which a reasonable official would understand that they could be liable for failing to preemptively address the potential for a suicide attempt absent any outward signs that Ms. Trowbridge was experiencing suicidal thoughts.  There is absolutely no evidence in the record that would support a finding that any of the named defendants knew that Ms. Trowbridge was experiencing suicidal ideations, or knew that there was a substantial risk that she would become suicidal.  (Depo. Joshua, M.D. at 24; Depo. Dregansky, D.O. at 74-75).  Although there may be a higher association between suicide and people in withdrawal than there is within the general population, there is no causal link that has been established between the two events.  (Depo. Joshua, M.D. at 27-28).  There is also no evidence that would support a finding that the defendants knew that being denied Suboxone

---

[22] Although *Lawler* was decided in 2024, it was analyzing conduct that occurred when the subjective standard for deliberate indifference was still the applicable test.  Therefore the cases it relied on constitute the "clearly established" law relevant to the qualified immunity issue in this case.

would create a substantial risk for suicide.[23]  Plaintiff's own expert testified that opiate withdrawal does not lead to suicidal ideation in all people, or even the "vast majority of people." (*Id.* at 39-40, 61-62, 95).  He also testified that there is no way to say what effect, if any, the cessation of Suboxone had on Ms. Trowbridge in this case.  (*Id.* at 95).

Just as in *Lawler*, Ms. Trowbridge denied feeling suicidal at intake and presented no other recognizable signs of risk.  She did not have any indication of suicidal intentions in her history, in her interactions with officials or in her recorded phone calls to her boyfriend, even on the day of her attempt.   Plaintiff's expert acknowledged that there was no factual basis to believe that Ms. Trowbridge was suicidal before she made her attempt.  He saw nothing in the transcripts of her telephone communications that would indicate she was suicidal. (Depo. Dregansky, D.O. at 33). He admitted that the tendency to have suicidal ideations during withdrawal is "individualized" and  that he did not "have any proof" Ms. Trowbridge was in a dangerous mental state or was showing any psychological signs of being suicidal.[24] (Depo. Dregansky, D.O. at 32).

In this case, qualified immunity applies to all defendants who sought it.  Plaintiff's case

---

[23] Plaintiff cites a 2014 publication by the Federal Bureau of Prisons, a 2021 report by the Department of Justice, and an 2019 F.D.A. warning that all linked withdrawal with suicidal thoughts or psychological symptoms.  The DOJ report was not published until after Ms. Trowbridge's death, and there is no evidence or even a reasonable inference that any of the Defendants were aware of these reports or warnings at the time of the incident. (ECF #56, PageID 1419-20).

[24] Nonetheless included in his report the opinion that Ms. Trowbridge's presumed withdrawal created the "dangerous mental state which led to suicide." He downplayed this opinion in his deposition stating that it withdrawal "could result in an impulsive act such as suicide." (*Id.* at 41-42).  Because Dr. Dregansky provided no factual support for his opinion that Ms. Trowbridge was suffering from withdrawal and consequently suicidal ideation, his opinion on this matter is not admissible.

rests on a finding that each defendant was deliberately indifferent to Ms. Trowbridge's serious medical needs because they prevented her from taking her prescribed Suboxone, and/or failed to place her on suicide protocol. There is no dispute that the jail's policy was to withhold narcotics, including Suboxone, even if they were properly prescribed by an outside doctor. Plaintiff argues that this was the cause of Ms. Trowbridge's suffering and death. Plaintiff has failed to meet their burden of showing that every reasonable officer, in June of 2020, would have understood that there was a clearly established right for Ms. Trowbridge to receive the narcotic Suboxone in jail, even in the absence of any physical or psychological indicators that she was experiencing withdrawal. Plaintiff also failed to establish that every reasonable officer, in June of 2020 would have understood there was a clearly established right for Ms. Trowbridge to be placed under suicide protocol even though she did not exhibit any sign of having suicidal thoughts.

To find liability in June of 2020, the clearly established law would have required that each defendant subjectively understood that withholding Suboxone, despite the existence of an alternative treatment plan, would create an unjustifiably high risk of harm due to withdrawal. Plaintiff has not provided any factual evidence to support a finding that Ms. Trowbridge was exhibiting any recognizable signs of withdrawal, or that any defendant subjectively believed that she was at risk of serious harm. Further, to defeat immunity with regard to Ms. Trowbridge's suicide attempt, Plaintiff would have had to show that each defendant understood not only that Ms. Trowbridge was in withdrawal and that withdrawal carries an unjustifiable risk of attempted suicide, but that the case law put them on notice that she had a constitutional right to be placed on a suicide prevention protocol even if she exhibited no current signs of withdrawal or suicidal

ideations.[25]  Neither the facts, nor the case law supports such a finding.  Therefore, reasonable officials would not have known that the failure to provide Suboxone or suicide prevention protocols, under these circumstances, was a violation of Ms. Trowbridge's constitutional rights.

Plaintiff has failed to meet their burden of establishing that withholding Ms. Trowbridge's Suboxone prescription violated a sufficiently particularized constitutional right that was clearly established in June of 2020.  They point to no cases prior to June of 2020 that have found officials could be held to be deliberately indifferent to medical needs when the inmate had neither complained of nor outwardly exhibited any associated symptoms or signs of serious risk.  Further, Plaintiff has not pointed to any case law that would have clearly informed a reasonable official that allowing an inmate to go through withdrawal, without Suboxone, but with the support of comfort medications when necessary, constitutes deliberate indifference, absent manifestation of some specific symptom or serious condition that arises during that process.

In addition, the non-medical officials, Captain Brooks, Sheriff Leonbruno, and Officer Pate were entitled to rely on the doctor's medical judgment that Ms. Trowbridge did not need Suboxone to avoid a substantial risk of serious harm.  *See, generally, McGaw v. Sevier Cty.*, 715 F. App'x 495, 498-99 (6th Cir. 2017); *Spears v. Ruth*, 589 F.3d 249, 255 (6th Cir. 2009).  It is not "unconstitutional for municipalities and their employees to rely on medical judgments made by

---

[25] Placing an inmate on suicide protocol unnecessarily could, in itself, be viewed as punitive by the inmate, to the point that some inmates will not report suicidal thoughts because they do not want to have to go through the protocol. (Depo. Kalina-Hammond at 51-52).  It involves removing everything except the mattress from the cell, including all clothing, regular sheets and blankets, and putting the inmate in a suicide smock.  The suicide smock is a thick padded garment, like a blanket that cannot be torn or turned into a ligature. (Depo. Leonbruno at 45-47).  They may also be provided a blanket made from the same inflexible material that cannot be torn.  (Depo. Kalina-Hammond at 49-50).

-31-

medical professionals responsible for prisoner care." *Est. Of Graham v. Cty. of Washtenaw*, 358 F.3d 377, 384 (6th Cir. 2004); see also, *Whyde v. Sigsworth*, 2022 U.S. Dist. LEXIS 59014. Therefore, Defendants, Dr. Karim Razmjouei, M.D., Frank Leonbruno, Capt. Cynthia Brooks, Bryan Pate, Patty Hammers, RN, and Sabrina Watson RN are all entitled to qualified immunity on Plaintiff's claim for deliberate indifference.

    2. <u>Supervisor Liability</u>

    Dr. Razmjouei and University Hospitals were not supervisors at the jail. At no time did they have a employer/employee relationship with, or supervisory authority over the County Defendants. (Aff. Karim Razmjouei at ¶¶4-8, ECF #28, Ex. H). Therefore, they cannot be liable for deliberate indifference based on other defendants' actions or omissions. In fact, no officials can be held accountable for the actions of others, and supervisors cannot be held liable for the conduct of their subordinates under the theory of *respondeat superior*. See, *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Supervisors can only be held liable if the engaged in some conduct that correlates with the alleged injury and rises to the level of "active unconstitutional behavior." *Bass v. Robinson*, 167 F.3d 1401, 1048 (6th Cir. 1999); *see also, Exxex v. City of Livingston*, 518 Fed. App'x 351, 355 (6th Cir. 2013). A "mere failure to act (even) in the face of a statistical pattern of incidents of misconduct"[26] is not sufficient to confer [supervisor] liability." *Bass v. Robinson*, 167 F.3d at 1048; *see also, Hays v. Jefferson Cty.*, 668 F.2d 869, 873-74 (6th Cir. 1982). Thus, Sheriff Leonburno and Captain Brooks cannot be held liable in their individual or

---

[26] No such statistical pattern has been established in this case. Although there is some evidence that withdrawal is a common problem within the jails, there is no evidence that other inmates became suicidal during withdrawal from opioids or Suboxone.

official capacities for the acts or omissions of other County employees.  They had no direct contact with Ms. Trowbridge and never saw her file prior to her suicide attempt.  (Depo. Brooks, Ex. B, at 8:11-25; Depo. Leonbruno).  There is no evidence that they actively participated in any unconstitutional behaviors.

In addition, Plaintiff makes no allegations that would support a finding of deliberate indifference against University Hospitals.  As set forth above, it cannot be held liable under a theory of *respondeat superior*,  and Plaintiff makes no allegation it engaged in conduct that correlates with the alleged injury and rises to the level of "active unconstitutional behavior." *Bass v. Robinson*, 167 F.3d 1401, 1048 (6th Cir. 1999).  Therefore, University Hospitals should be granted summary judgment on Plaintiff's claim of deliberate indifference.

Finally, a local government "is liable as an entity only when the government itself has committed the constitutional violation, not when the violation was committed by its employees." *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993).  Therefore, Lake County, and Lake County Bd. of Commissioners, cannot be liable for the acts or omissions of their employees simply by nature of their status as employers or supervisors.

### 3. *Monell* Liability for Deliberate Indifference

"[A]n official capacity suit does not require a showing of supervisory liability." *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989).  To establish liability against a governmental entity, for deliberate indifference, the Plaintiff "must demonstrate that there was an official custom or policy that was instituted or maintained "with 'deliberate indifference' to its known or obvious consequences." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 407 (1997).  "Deliberate indifference is a stringent standard of fault, requiring proof that a

-33-

municipal actor disregarded a known or obvious consequence of his action." *Id.* at 410. The government's policy or custom "must be 'the moving force of the constitutional violation' in order to establish the liability of a government body under Section 1983.'" *Searcy v. City of Dayton*, 38 F.3d 282, 286 (1994)(quoting *Monell v. New York City Dept. Of Social Srvs.*, 436 U.S. 658 (1978)).

Plaintiff has not provided any written policy in effect in June of 2020 that indicates that Suboxone or other narcotic prescriptions were to be withheld from inmates. However, there is testimonial evidence that creates, at least, a genuine issue of material fact as to the existence of such a policy or custom. Both Dr. Razmjouei and Nurse Hammers testified that they withheld Ms. Trowbridge's Suboxone prescription based on their understanding that no narcotic prescriptions were to be distributed in the jail. (Depo. Razmjouei, M.D. at 34, 60, 71-74). Dr. Razmjouei and others did testify, however, that if Suboxone or other narcotic medications were required based on a inmate's symptomology, they could be prescribed and the inmate could receive them at an off-site medical facility. (Depo. Razmjouei, M.D. at 71). This comports with Sheriff Leonbruno and Captain Brooks' testimony that medical decisions, including whether to withhold certain prescriptions, were ultimately deferred to the jail doctors. (Depo. Leonbruno at 21-22, 30-34, 42, 57-59).

In order to show the potential for *Monell* liability based on a policy or custom of the governmental entity, Plaintiff must prove a constitutional violation attributable directly to the municipality's policy, or a violation by one of its employees. *Gomez v. City of Memphis*, 2023 U.S. App. LEXIS 20180, *20 (6th Cir. 2023)(citing *Baker v. City of Trenton*, 936 F.3d 523, 535 (6th Cir. 2019)). Assuming that the County did have a policy to withhold narcotics from inmates,

-34-

Plaintiff has not provided sufficient evidence that would allow a jury to find that the policy was enacted with 'deliberate indifference' to the known or obvious consequence that it could lead to serious medical issues stemming from withdrawal, or to a substantial risk of suicide. As set forth above, even Plaintiff's expert admits that not all people who stop narcotics experience withdrawal symptoms. Of those that do have symptoms, not everyone experiences serious medical issues during withdrawal. Further, there is no evidence of a causal relationship between experiencing withdrawal (particularly from Suboxone) and a substantial risk of suicidal ideations. On the other hand, the Defendants have presented evidence suggesting that such a policy was arguably justified as an attempts to preclude narcotic abuse within prisons, and that the jail had other methods of addressing any serious medical need, including psychological needs that may arise during an inmate's withdrawal from Suboxone. Finally, there is evidence that Suboxone could be provided to an inmate (at an outside facility) if first line comfort and anti-craving medications were not sufficient to address their serious medical needs.

It is not unconstitutional for governmental entities and their employees "to rely on medical judgments made by medical professionals responsible for prisoner care." *Est. of Graham v. Cty. of Washtenow*, 358 F.3d 377, 384 (6th Cir. 2004). The evidence in this case, taken in the light most favorable to the Plaintiff, shows that although narcotics were not allowed to be provided within the jail, the jail doctor knew that he had the authority to prescribe narcotics and to order that the inmate be taken to an outside medical facility to receive them, if it was medically necessary. Thus, Dr. Razmjouei did have the authority to authorize Ms. Trowbridge to receive Suboxone, if he determined it was necessary to prevent serious harm. Because the County's policy ultimately deferred to the judgments made by the medical professionals responsible for

-35-

prisoner care, and did not categorically prohibit the administration of Suboxone to Ms. Trowbridge, that policy was not the driving force of a constitutional violation. Further, because it provided other first line treatments, the policy was not deliberately indifferent to the needs of addicted inmates. Therefore, Plaintiff has failed to provide evidence that could support a jury's finding that Lake County, or the Lake County Board of Commissioners instituted policies that were deliberately indifferent to the serious medical needs of Ms. Trowbridge.

### 4. Crossroads

Crossroads is a 501(c)(3) charitable organization, hired by Lake County to provide mental health and addiction services to the County, including to the Lake County Jail. (Depo. Kalina-Hammond at 9). Crossroads, an independent contractor, was contracted with LCADF in June of 2020 to provide mental health services for inmates. Crossroads provided addiction counseling and programs only to sentenced inmates, and not to pretrial detainees. (*Id.* at 12-13).[27] Crossroads did provide screening services for pretrial detainees. (*Id.* at 39). Generally, Crossroads performed these screens within three days of an inmate's arrival. (*Id.*). However, because of the COVID-19 pandemic, all new arrivals were placed in quarantine for fourteen days to stem the spread of COVID-19 within the jail. (Depo. Leonbruno at 13-16). Due to the quarantine, Crossroads did not screen inmates within the fourteen day period absent a "crisis" situation. (Depo. Kalina-Hammond at 39-40).

---

[27] At the time Ms. Trowbridge was incarcerated, Crossroads did not provide any medication to patients for addiction or withdrawal. (Depo. Kalina-Hammond at 20-21). They now provide comfort medications, including hydroxyzine to reduce blood pressure and anxiety, and regulate heart rate. (Depo. Kalina-Hammond at 20-22). They do not provide medically assisted treatment ("MAT") to treat addiction or withdrawal. They are not qualified to prescribe MAT (including Suboxone). (Kalina-Hammond Depo. at 16-17, 32-33, 54-55).

If an inmate or pre-trial detainee was known to be having suicidal thoughts or ideation, even if it was during the fourteen day COVID-19 quarantine period, Crossroads would accept a referral or an inmate request for crisis care. (Depo. Kalina-Hammond at 39, 82-83). Because Ms. Trowbridge did not present with signs of being in crisis, Crossroads was not asked to screen her before her quarantine period was complete. She was released to the hospital as a result of her attempted suicide before she completed the fourteen day quarantine. Therefore, Ms. Trowbridge was never screened by Crossroads.

Under current Sixth Circuit jurisprudence, in order to prove a deliberate indifference claim, a pre-trial detainee "must demonstrate (1) an objectively serious medical need; and (2) that the defendant intentionally acted (or failed to act), either ignoring the serious medical need or 'recklessly fail[ing] to act reasonably to mitigate the risk the serious medical need posed.'" *Grote v. Kenton Cty.*, 85 F.4th 397, 405 (6th Cir. 2023)(citing *Greene v. Crawford Cty*, 22 F.4th 593, 607 (6th Cir. 2021)(quoting *Brawner v. Scott County*, 14 F.4th 585, 597 (6th Cir. 2021)), *cert denied*, 142 S. Ct. 84 (2022). To satisfy the second prong, post *Brawner*, Plaintiff must be able to prove that the Defendant "acted deliberately (not accidentally), but also recklessly "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Helphensitine v. Lewis Cty., Kentucky*, 60 F.4th 305, 317 (6th Cir. 2023)(internal quotations omitted); *Gomez* at *13.

It is undisputed that Crossroads and its representatives never saw, spoke to, or interacted with Ms. Trowbridge in any fashion. It is undisputed that Crossroads never received a referral or a request for screening, treatment or other services in connection with Ms. Trowbridge. It is, in fact, undisputed that Crossroads was never made aware that Ms. Trowbridge had been admitted

-37-

to Lake County Adult Detention Facility. (Depo. Kalina-Hammond at 36-37, 64-65). Even if they had been aware, Plaintiff expressly acknowledges that Crossroads was not involved in the administration of medications to inmates or detainees. (ECF #56 at 31). There is no evidence in the record to suggest that Ms. Trowbridge communicated any concerns, or exhibited any signs of serious withdrawal or risk for self-harm prior to her suicide attempt. (*See* Dregansky Dep. At 33, 39, 74-75, 88). In addition, Crossroads did not supervise any of the other Defendants. Therefore, Plaintiff cannot show that Crossroads knew of any risk of harm to Ms. Trowbridge, and consequently cannot establish that is was deliberately indifferent to Ms. Trowbridge's serious medical needs.

B. Failure to Train

The County, Sheriff Frank Leonbruno, Captain Cynthia Brooks, Crossroads, University Hospitals, and Dr. Razmjouei, are all named in Plaintiff's failure to train claim. A failure to train claim is established when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 388-89 (1989). In sum, to succeed on this claim, a plaintiff must prove that "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

Plaintiff claims that the County defendants failed to provide adequate training on how to care for individuals suffering from addiction, but does not articulate what additional training would be adequate, or how the alleged failure caused Ms. Trowbridge's harm. The failure to

-38-

train theory is undermined by Plaintiff's insistence that there was an official policy prohibiting the distribution of narcotics in the jail. If narcotics were prohibited, and the staff knew not to provide them, proper training was not the cause of her harm, the policy was. If there was no such policy, then staff was entitled to rely on the medical judgment of Dr. Razmjouei, who Plaintiff alternatively argues had the authority to prescribe Suboxone. Either way, there was no evidence that Ms. Trowbridge exhibited symptoms that would have triggered personnel, with any level of training, to understand she was at substantial risk of suffering serious harm from withdrawal or suicidal ideations.

Further, Crossroads, University Hospitals, and Dr. Razmjouei had no authority to train, supervise, or discipline other county officials, including the corrections officers and the nursing staff at the jail. (ECF #28, Ex. H: Aff. Karim Razmjouei at ¶¶ 4-7; ). Therefore, they cannot be held liable for failure to train the individual defendant's in this case. There is no evidence that a similar situation would likely reoccur without additional training, and it was not predictable that any official lacked specific tools to avoid the allegations at issue in this case. In light of this evidence, a reasonable juror could not infer that the County failed to adequately train its employees or that such failure, if any, amounted to deliberate indifference. Consequently, the Defendants' motion for summary judgment is granted with respect to this claim.

C. Wrongful Death

In Plaintiff's third cause of action, they allege a claim for wrongful death under Ohio state law. When all federal claims in a case are dismissed, there is a strong presumption in favor of dismissing any remaining state law claims unless the plaintiff can establish an alternate basis for federal jurisdiction. *Bishop v. Children's Ctr. For Developmental Enrichment*, 618 F.3d 533 (6th

Cir. 2010)(citing 28 U.S.C. 1367). When determining whether to exercise supplemental jurisdiction following dismissal of all federal claims, a district court should "consider and weigh several factors, including 'the values of judicial economy, convenience, fairness, and comity." Gamel v. City of Cincinnati, 625 F.3d 949, 951 (6ᵗʰ Cir. 2010)(quoting *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered. . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie Mellon* , 484 U.S. at 350, n. 7.

In this case, an Ohio resident was allegedly harmed by Ohio entities, including local governmental bodies. There is a challenge to the sufficiency of expert reports/testimony that could have broader effect on state law cases going forward. The issue involves policies and potential precedent that may also affect other governmental agencies within the state. These circumstances give the state a very strong interest in resolving the claim. Further, it involves the potential application of governmental immunity under state law, and differing legal standards for different categories of defendants. Although there are some overlapping issues with the federal law issues that have been resolved, the federal issues do not necessarily determine the outcome of the state law claim. After weighing the factors, the Court does not find substantial justification for retaining supplemental jurisdiction over the wrongful death claim.

## Conclusion

For the reasons set forth above, Plaintiff's Request for Judicial Notice is GRANTED. (ECF #52), and Defendants' Motions for Summary Judgment are GRANTED. (ECF #28, 37, 39,

40).   Count One (Deliberate Indifference) is dismissed with prejudice as against Defendants

Karim Razmjouei, M.D., Frank Leonbruno, Capt. Cynthia Brooks, Bryan Pate, Patty Hammers,

RN, and Sabrina Watson RN based on qualified immunity.   Judgment is ordered in favor of the

Defendants, Crossroads, University Hospitals, Lake County, and Lake County Bd. of

Commissioners on Count One (Deliberate Indifference).   Judgment is order in favor of all

Defendants named in  Count Two. (the County, Sheriff Frank Leonbruno, Captain Cynthia

Brooks, Crossroads, University Hospitals, and Dr. Razmjouei).   Claims against the Doe

Defendants were abandoned, and are, therefore, dismissed with prejudice.   The Court further

declines to retain supplmental jurisdiction over the state law claim set forth in Count Three.   Each

party shall bear its own costs.   IT IS SO ORDERED.


DONALD C. NUGENT
United States District Judge

DATED: October 28, 2024